KELLY KLAUS (SBN 161091)
Kelly.Klaus@mto.com
ROSE LEDA EHLER (SBN 296523)
Rose.Ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

LAUREN E. ROSS (*pro hac vice pending*)
Lauren.Ross@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, Seventh Floor
Washington, D.C. 20004
Telephone:   (202) 220-1100
Facsimile:    (202) 220-2300

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC.; PARAMOUNT PICTURES CORPORATION; AMAZON CONTENT SERVICES LLC; WARNER BROS. ENTERTAINMENT INC.; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; UNIVERSAL CONTENT PRODUCTIONS LLC; NETFLIX STUDIOS, LLC; COLUMBIA PICTURES INDUSTRIES, INC.; and STUDIOCANAL S.A.S., <br><br> Plaintiffs, <br><br> vs. <br><br> TTKN ENTERPRISES, LLC D/B/A CRYSTAL CLEAR MEDIA; TODD SMITH; and TORI SMITH, <br><br> Defendants. | Case No.  2:20-cv-07274-GW-JPR <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge:        Hon. George H. Wu <br> Date:         September 17, 2020 <br> Time:         8:30 a.m. <br> Courtroom:  9D <br><br> Filed concurrently herewith: <br> (1) Declaration of Jan van Voorn <br> (2) Declaration of Steve Kang <br> (3) Declaration of Rose Leda Ehler <br> (4) [Proposed] Preliminary Injunction <br><br> Trial Date: None Set |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 17, 2020, at 8:30 a.m., or as soon thereafter as counsel may be heard,[1] before the Honorable George H. Wu, in Courtroom 9D of the United States District Court for the Central District of California, located at First Street Courthouse, 350 W. First Street, Los Angeles, California 90012, Plaintiffs Disney Enterprises, Inc., Paramount Pictures Corporation, Amazon Content Services LLC, Warner Bros. Entertainment Inc., Universal City Studios Productions LLLP, Universal Content Productions LLC, Netflix Studios, LLC, Columbia Pictures Industries, Inc., and Studiocanal S.A.S. (collectively, "Plaintiffs"), will, and hereby do, move for a Preliminary Injunction:

[1]     enjoining Defendants TTKN Enterprises, LLC d/b/a Crystal Clear Media, Todd Smith, and Tori Smith (collectively, "Defendants"), and all individuals acting in concert or participation or privity with them, including Defendants' resellers, from publicly performing, reproducing, distributing, or otherwise infringing in any manner (including without limitation by materially contributing to or intentionally inducing the infringement of) any of Plaintiffs' rights under the Copyright Act in any motion picture, the rights to which Plaintiffs own or control ("Copyrighted Works").

[2]     enjoining the respective domain name registrars for Defendants' Websites[2] from allowing these domains to be modified, sold, transferred to another owner, or deleted, and also requiring them to disable access to the Websites.

_____

[1] Plaintiffs have commenced this action and served this Motion to seek preliminary injunctive relief pending adjudication of their claims.  However, without waiver or prejudice as to their assertion that the requested preliminary relief is necessary to prevent irreparable harm to their rights, Plaintiffs defer to the Court as to the proper timing for this Motion in light of the exigent circumstances and limitations on judicial resources created by the current COVID-19 public health emergency.

[2] Defendants own and/or control several Internet domains (collectively "Websites") used in their infringing enterprise, including infringement:  ccbilling.org, cciptv.us,

This Motion is made on the following grounds as explained in the accompanying Memorandum of Points and Authorities and supporting papers: (1) Plaintiffs are likely to succeed on the merits because the evidence clearly shows that (a) Defendants, without authorization from Plaintiffs, transmit performances of the Copyrighted Works to members of the public, in violation of Plaintiffs' exclusive rights to publicly perform the Copyrighted Works, 17 U.S.C. § 106(4), and (b) Defendants are either directly or secondarily liable for the infringement of Plaintiffs' exclusive reproduction rights in the unauthorized copying of the Copyrighted Works for Defendants' 24/7 channels and VOD offerings, *id*. § 106(1); (2) absent a preliminary injunction, Plaintiffs will suffer irreparable harm, including with respect to their ability to exercise their exclusive rights, their relationships and goodwill with authorized licensees, and the development of the market for on-demand streaming; (3) the balance of the equities tips decidedly in Plaintiffs' favor; and (4) an injunction is in the public interest.

This Motion is based upon this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Jan van Voorn ("Van Voorn Decl."), Steve Kang ("Kang Decl."), and Rose Leda Ehler ("Ehler Decl.") and Exhibits thereto; all documents on file in this action; and such further or additional evidence or argument as may be presented before or at the time of the hearing on this Motion.

DATED:  August 14, 2020                    MUNGER, TOLLES & OLSON LLP


By:  _____/s/ Rose Leda Ehler_____
        ROSE LEDA EHLER
        Attorneys for Plaintiffs

---

ccmedia.one, ccreborn.one, ccultimate.one, crystalcleariptv.com, mediahosting.one, superstreamz.com, webplayer.us.  Declaration of Jan Van Voorn ¶ 11.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

    A.    Plaintiffs And Their Copyrighted Works.................................................. 2

    B.    Defendants' Infringing Service—Crystal Clear Media ......................... 3

        1.    Defendants' Infringing IPTV Service............................................. 3

        2.    Defendants' Infringing VOD Service............................................. 6

    C.    Defendants Rely On An Expanding Network Of Resellers To Increase Subscribers And Profits................................................................ 7

    D.    Defendants Know Their Unauthorized Service Is Illegal....................... 9

ARGUMENT ......................................................................................................... 10

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................. 11

    A.    Plaintiffs Own Or Control Valid Copyrights In The Works That Defendants Exploit................................................................................ 11

    B.    Defendants' Infringe Plaintiffs' Exclusive Rights............................... 12

        1.    Defendants Publicly Perform Plaintiffs' Copyrighted Works And Are Directly Liable For Infringement..................... 12

        2.    Defendants Are Responsible For The Infringing Reproduction Of Plaintiffs' Copyrighted Works ...................... 13

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ...................................................................................... 18

III.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFFS' FAVOR ........................................................................... 22

IV.    AN INJUNCTION WOULD SERVICE THE PUBLIC INTEREST............. 22

RELIEF REQUESTED ......................................................................................... 23

    A.    Plaintiffs Request An Injunction That Protects Their Copyrights........ 23

    B.    No Bond Should Be Required................................................................ 24

CONCLUSION...................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .......................................................... 11, 13, 15, 16

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
  573 U.S. 431 (2014) ........................................................................................ 12

*Amazon Content Servs., LLC v. Set Broad., LLC*,
  No. 2:18-cv-03325-MWF-ASx, ECF No. 59
  (C.D. Cal. July 31, 2019) .................................................................................... 2

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ................................................................ 22

*Arista Records LLC v. Lime Group LLC*,
  No. 06 CV 5936 (KMW), 2011 WL 1641978
  (S.D.N.Y. Apr. 29, 2011) .................................................................................... 13

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................................ 13

*Cadence Design Sys., Inc. v. Avant! Corp.*,
  125 F.3d 824 (9th Cir. 1997) ............................................................................. 22

*China Cent. Television v. Create New Tech. (HK) Ltd.*,
  No. CV 15-01869-MMM-MRWx, 2015 WL 3649187
  (C.D. Cal. June 11, 2015) .................................................................................. 18

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ................................................................. 16, 17, 18

*Columbia Pictures Indus., Inc. v. Galindo (Nitro TV)*,
  No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347
  (C.D. Cal. May 11, 2020) .......................................................................... 1, passim

*Diaz v. Brewer*,
  656 F.3d 1008 (9th Cir. 2011) ............................................................................. 24

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Disney Enterprises, Inc. v. VidAngel Inc.*,
  No. 2:16-cv-04109-AB-PLAx, ECF No. 520
  (C.D. Cal. Sept. 5, 2019) ................................................................... 2

*Disney Enters., Inc. v. VidAngel, Inc.*,
  371 F .Supp. 3d 708 (C.D. Cal. 2019) ............................................... 13

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...................................................... 11, 23

*Disney Enters., Inc. v. VidAngel, Inc. (VidAngel I)*,
  224 F. Supp. 3d 957 (C.D. Cal. 2016),
  *aff'd*, 869 F.3d 848 (9th Cir. 2017) ................................ 11, 12, 19, 20

*Eldred v. Ashcroft*,
  537 U.S. 186 (2002) ........................................................................ 22

*Elsevier Inc. v. Stew Yee Chew*,
  No. 17 civ. 6225 (JGK) (GWG), 2019 WL 74606
  (S.D.N.Y. Jan. 2, 2019) ................................................................... 15

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ............................................................. 16

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
  915 F. Supp. 2d 1138 (C.D. Cal. 2012) ............................. 12, 18, 20, 21

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) .......................................................... 24

*Kelly v. Primco Mgmt., Inc.*,
  No. CV-1407263 BRO, 2015 WL 10990368
  (C.D. Cal. Jan. 12, 2015) ................................................................. 23

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) .............................................. 21

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................... 16, 17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Nat'l Football League v. PrimeTime 24 Joint Venture*,
   211 F.3d 10 (2d Cir. 2000) ................................................................. 13

*Netflix v. Dragon Media Inc.* (*Dragon Box*),
   No. 2:18-cv-00230-MWF-ASx, ECF No. 59
   (C.D. Cal. Jan. 29, 2019) ..................................................................... 2

*Paramount Pictures Corp. v. Omniverse World Television, Inc.*,
   No. 2:19-cv-01156-MWF-ASx, ECF No. 60
   (C.D. Cal. Nov. 14, 2019) .................................................................... 1

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ..................................................... 11, 16

*Showtime Networks Inc. v. Doe*,
   No. 2:15-CV-03147-GW-MRW, 2015 WL 12646501
   (C.D. Cal. Apr. 30, 2015) ................................................................... 24

*Solid Host, NL v. Namecheap, Inc.*,
   652 F. Supp. 2d 1092 (C.D. Cal. 2009) ............................................. 15

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995),
   *superseded by statute on other grounds*, 17 U.S.C. § 117(c) ............... 22

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ........................................................... 11

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
   No. 2:17-cv-07496-MWF-ASx, ECF No. 72 (C.D. Cal. Sept. 12,
   2018) ..................................................................................................... 2

*VHT, Inc. v. Zillow Grp., Inc.*,
   918 F.3d 723 (9th Cir. 2019) ............................................................. 16

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.* (*Zediva*),
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................... 12, 19, 20, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 2, 11, 22

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3

*WPIX, Inc. v. ivi, Inc.*,
    691 F. 3d 275 (2d Cir. 2012) .................................................................. 18

4

5

**FEDERAL STATUTES**

6

17 U.S.C. § 101 ......................................................................................... 12

7

17 U.S.C. § 106 ......................................................................... 1, 11, 12, 13

8

17 U.S.C. § 410 ......................................................................................... 11

9

10

17 U.S.C. § 502 ......................................................................................... 10

11

17 U.S.C. § 504 ......................................................................................... 21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendants TTKN Enterprises, LLC and its controlling members, Todd and Tori Smith own and operate Crystal Clear Media ("CCM"), an unauthorized online subscription streaming service that engages in mass infringement of Plaintiffs' Copyrighted Works.  Defendants themselves, or through their expanding web of unauthorized resellers, sell their customers access to illegal streams of over 6,000 live and curated programming channels and video-on-demand ("VOD") streams of over 14,000 movies and 3,000 televisions series.  Defendants' offerings feature popular movies and television programs whose copyrights are owned or exclusively controlled by Plaintiffs (the "Copyrighted Works"), including, to name only a few, Disney's *Maleficent*, Paramount's *The Truman Show*, and Netflix's *A Series of Unfortunate Events.*

Defendants are not licensed to do any of these things.  Instead Defendants blatantly infringe Plaintiffs' rights under the Copyright Act.  Their unauthorized streaming infringes Plaintiffs' exclusive rights to publicly perform their Copyrighted Works, 17 U.S.C. § 106(4), and the creation of their title- or franchise-dedicated "24/7" channels and VOD service requires the mass unauthorized copying of the Copyrighted Works, in violation of Plaintiffs' exclusive reproduction rights, *id.*, § 106(1).

Defendants are the latest in a long line of illegal online streaming services that steal Plaintiffs' content to reap ill-gotten profits.  Plaintiffs have been forced to pursue multiple actions against such services, successfully seeking injunctive relief to stop this brazenly illegal activity.[3]  The same result should follow here.

---

[3] *See Columbia Pictures Indus., Inc. v. Galindo* (*Nitro TV*), No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347 (C.D. Cal. May 11, 2020) (preliminary injunction); *See Paramount Pictures Corp. v. Omniverse World Television, Inc.*, No. 2:19-cv-01156-MWF-ASx, ECF No. 60 (C.D. Cal. Nov. 14, 2019) (permanent injunction);

The case for immediate injunctive relief here is overwhelming.  Defendants are knowing infringers of Plaintiffs' rights on a mass scale.  Defendants have gone to great lengths to try to hide their illegal activity.  They use a false "Virtual Reality Gaming" moniker to cover up their illegal VOD service—for example, Todd Smith has told customers that their "Virtual Reality Gaming" plan is "NOT a VR Gaming plan, it is really our VOD service."  And Defendants utilize a growing network of resellers, enticing third parties to aggressively market subscriptions to the CCM service for a share of their unlawful gains.

Defendants' illegal enterprise inflicts irreparable harm on Plaintiffs, undermining their relationships with licensees and the legitimate marketplace for authorized access to Copyrighted Works.  That harm will worsen if Defendants' operations continue unchecked.  Plaintiffs satisfy each of the *Winter* elements for preliminary injunctive relief and respectfully request the Court grant this motion and enter the concurrently filed proposed injunction.

## FACTUAL BACKGROUND

### A.    Plaintiffs And Their Copyrighted Works

Plaintiffs or their affiliates produce and distribute a significant portion of the world's most popular movies and television programs.  Declaration of Steven Kang ("Kang Decl.") ¶ 4.  The development, production, and distribution of these works requires substantial, ongoing investments.  *Id.* ¶ 6.  Copyright protection therefore is of critical importance to Plaintiffs' ability to earn a return on their investments and to invest in new projects.  *Id.* ¶¶ 6-7.

---

*Amazon Content Servs., LLC v. Set Broad., LLC*, No. 2:18-cv-03325-MWF-ASx, ECF No. 59 (C.D. Cal. July 31, 2019) (permanent injunction); *Netflix v. Dragon Media Inc.* (*Dragon Box*), No. 2:18-cv-00230-MWF-ASx, ECF No. 59 (C.D. Cal. Jan. 29, 2019) (permanent injunction); *Disney Enterprises, Inc. v. VidAngel Inc.*, No. 2:16-cv-04109-AB-PLAx, ECF No. 520 (C.D. Cal. Sept. 5, 2019) (permanent injunction); *Universal City Studios Prods. LLLP v. TickBox TV LLC*, No. 2:17-cv-07496-MWF-ASx, ECF No. 72 (C.D. Cal. Sept. 12, 2018) (permanent injunction).

Plaintiffs or their affiliates own or control the exclusive rights to reproduce, distribute, and publicly perform the Copyrighted Works, including by means of streaming performances of the Copyrighted Works over the Internet.  Declaration of Rose Leda Ehler ¶¶ 2-43, Exs. 1-42; Kang Decl. ¶ 4.  Plaintiffs authorize the legitimate distribution and public performance of the Copyrighted Works in various formats and through multiple distribution channels, including through cable and direct-to-home satellite services, authorized Internet VOD services, and authorized Internet or over-the-top ("OTT") streaming services, among many others.  *Id.* ¶¶ 7-8.

Plaintiffs have not licensed Defendants to exercise any of their rights to the Copyrighted Works.  *Id.* ¶ 4; Declaration of Jan van Voorn ("Van Voorn Decl.") ¶ 8.

**B.**     **Defendants' Infringing Service—Crystal Clear Media**

Defendants own and operate Crystal Clear Media ("CCM"), an online streaming service that provides subscribers with infringing streams of Plaintiffs' Copyrighted Works (and the copyrighted works of many other parties as well).  Van Voorn Decl. ¶¶ 11–15, Exs.1–4.  Defendants' subscribers access infringing content through a web-based platform or CCM applications for use on smart TVs or mobile phones (collectively the "CCM Platforms").  *Id.* ¶¶ 7–8, 20, Ex. 8.  Defendants offer two infringing options:  (1) Internet protocol television ("IPTV") and (2) VOD.  *See generally id.* ¶¶ 16–31, Exs. 5–16.

**1.**     **Defendants' Infringing IPTV Service**

Defendants' IPTV service live-streams thousands of pre-programmed channels.  Many of these are hijacked from legitimate channels, such as ABC, NBC, National Geographic, HBO and others, transmitted through licensed commercial providers, and then streamed by Defendants without authorization.  Van Voorn Decl. ¶¶ 22–24, 27.  Defendants also stream live transmissions of illegitimate "24/7" channels, which have been curated from illegitimate copies of popular television

programs and movie franchises and then streamed around-the-clock by Defendants. *Id.* ¶¶ 25–27.

The IPTV service works as follows:  Defendants sell their customers subscriptions to the IPTV service.  *Id.* ¶ 17.  Defendants sell the subscriptions through their own Website[4] and through third-party resellers (discussed in further detail in Section C, *infra*).  *Id.*  Monthly subscription prices range from $14.99 to $39.99 per month, depending on the number of connections and channel offerings a user selects.  *Id.* ¶¶ 17–18, Ex. 6.

After buying a subscription, the customer gets login-credentials and detailed instructions for accessing the service.  *Id.* ¶¶ 19–20, Exs. 7, 8.  Following the instructions, subscribers can access this service through a variety of different CCM Platforms, including by downloading an application on their smart TV, mobile device, or logging on to a website.  *Id.* ¶ 21, Ex. 9.  Once logged into a CCM Platform, a subscriber can choose from a staggering number—now over 6,000—of live television channels.  *Id.* ¶ 22, Ex. 10.  The volume and channel offerings far exceed what a customer could obtain through a legitimate licensed service (let alone at the same price point).  Kang Decl.  ¶ 28.  For example, Defendants stream live broadcast networks, which originate with authorized transmissions (but are streamed without authorization by Defendants).  Van Voorn Decl. ¶ 23–24.  These channels are streamed contemporaneously with the original source of the telecast, but unlike authorized transmissions, Defendants' streams do not comply with geographic restrictions; as a result, subscribers in New York can watch channels available only in Los Angeles (and vice versa).  *Id.* ¶ 23, Ex. 11.  For no additional charge,

---

[4] The particular Website Defendants use to sell subscriptions is mediahosting.one. Van Voorn Decl. ¶¶ 17–18, Ex. 6.  Defendants have previously used the domains crystalcleariptv.com, ccmedia.one, ccbilling.org, ccultimate.one, superstreamz.com and cciptv.us, to market and sell subscriptions.  *See id.* ¶ 11.  Finally webplayer.us hosts the web-based video player and ccmedia.one hosts the application through which customers can watch the unauthorized Copyrighted Works.  *Id.* ¶ 20.

Defendants also offer paid cable channels like BET, Disney Channel, ESPN, FX, Paramount Network, SyFy and USA, and many others, as well as premium channels, like HBO and Showtime.  *Id.* ¶ 24.

Defendants also offer what they label as "24/7" channels.  *Id.* ¶ 25.  These 24/7 channels continuously stream a single movie, all of the movies in a franchise or collection, or all of the episodes in a television series.  *Id.* ¶ 25.  By way of example, the 24/7 channel dedicated to Warner Bros.'s *Just Mercy*, streams that movie continuously.  *Id.* ¶ 25, Ex. 12.  These offerings necessarily involve making copies to provide the content that populates the channels.  *Id.* ¶ 26; *see* Section I.B.2, *infra*. Defendants thereby provide their customers some of Plaintiffs' most popular Copyrighted Works through their 24/7 channels, including Universal's *Mr. Robot* television series, Netflix's *A Series of Unfortunate Events* series, and Warner Bros.'s *Harry Potter* movies.  *Id.* ¶ 25.  Customers can also search within categories for specific television programs or movies that they would like to watch.  *Id.* ¶ 22.

Once a CCM subscriber clicks a channel offering—live-channel or 24/7— Defendants stream the content playing on that channel to the subscriber.  *Id.* ¶¶ 23, 25, Exs. 11, 12.   The image below features *Just Mercy* (2019) streaming on the 24/7 "Cinema: Just Mercy" channel:



*Id.* ¶ 25, Ex. 12.

Defendants are using their Websites and technology to transmit these unauthorized streams.  *Id.* ¶ 27.  Indeed, the evidence shows that one of Defendants' Website domains—ccreborn.one—is the source of the streams from Defendants' IPTV to subscribers.  *Id.*  Defendants thus directly exercise Plaintiffs' exclusive right of public performance.  *See* Argument, Section I.B.1, *infra*.

### 2.     Defendants' Infringing VOD Service

Defendants offer their VOD service as a $10-a-month add-on to the IPTV subscription.  Van Voorn Decl. ¶ 42.  The VOD service allows subscribers to access a vast library of copyrighted content—over 14,000 movies and 3,000 television series (many of which include multiple seasons and multiple episodes per season)— for immediate on-demand viewing.  *Id.* ¶ 29, Ex. 15.  Customers can choose from numerous categories, such as "2020 Movies," "Amazon Originals," "Netflix Originals," "4K DC Universe," and "Disney+."  *Id.*



MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

When a customer selects a category, e.g., "TV Shows – Netflix Originals," a list of titles (along with thumbnail images showing a theatrical poster or cover art for the title) appears on the customer's screen. *Id.* ¶ 30, Ex. 16.



Another click and the subscriber can stream the movie, start to finish, through the CCM Platform. *Id.* ¶ 31. Providing a VOD service necessarily means that copies of the Copyrighted Works have been made and stored on servers, from which streams can be provided "on demand." *Id.* ¶ 32; *see* Section I.B.2, *infra*.

The Copyrighted Works provided via the VOD service include Amazon's *The Man in the High Castle* and StudioCanal's *Paddington 2*, among many others. See Complaint, Ex. A.

**C.      Defendants Rely On An Expanding Network Of Resellers To Increase Subscribers And Profits**

Defendants have expanded the scope of their unlawful commercial enterprise by creating and growing a network of resellers who market and promote the CCM service to attract new subscribers to the illegal service. Van Voorn Decl. ¶¶ 33, 35, Ex. 17. These resellers buy what Defendants euphemistically call "web hosting" plans. *Id.* Web hosting plans are actually bulk subscriber credentials. Defendants

sell these bundles of credentials at volume discounts, and the resellers then sell individual subscriptions to customers. *Id.* ¶ 34. For example, a reseller buying 25 credits for $110.00 would pay a per credit price of $4.40; a "Pro" reseller purchasing 200 credits for $620.00 would pay a per credit price of $3.10; and a "Max" reseller purchasing 1000 credits for $2,100.00 would pay a per credit price of $2.10. *Id.* ¶ 34, Ex. 6.

Defendants' reseller program plays a pivotal role in their infringing enterprise in several ways. First, the reseller program dramatically increases Defendants' customer-base and profits—more resellers means more customers buying illegal access to the Copyrighted Works and other copyrighted content, and more money flowing into Defendants' pockets. *See id.* ¶¶ 33–34. Second, Defendants' resellers market and promote CCM. *Id.* ¶ 34. For example, the following advertisement by StreamZ IPTV, which is "powered" by Crystal Clear Media, tells customers they provide the "Highest Quality" for the "Lowest Cost" and offer the "MOST RELIABLE ALTERNATIVE TO CABLE AND SATELLITE TV." *Id.* ¶ 34, Ex. 17.



1  *Id.*  And third, Defendants use resellers to hide their illegal role as the orchestrators

2  of the enterprise.  Defendants have deleted their own marketing and promotional

3  material that mention the CCM service in particular, in an apparent effort to cover

4  their tracks after other defendants operating infringing IPTV services have faced

5  litigation and been enjoined.  *Id.* ¶¶ 39–41, Exs. 20, 21; *see, e.g.*, *Nitro TV*, 2020

6  WL 3124347, at *2 (enjoining another pirate defendant in May 2020).  Their

7  userbase and profits nevertheless continue to grow through their reseller network.

8  Van Voorn Decl. ¶¶ 35–37, Exs. 17–19.

9      **D.**    **Defendants Know Their Unauthorized Service Is Illegal**

10         Defendants know they are breaking the law.  Among other things, they have

11  gone to great lengths to hide the fact they are offering an unauthorized VOD service,

12  betraying Defendants' knowledge that doing so is illegal.  Van Voorn Decl. ¶¶ 41–

13  42.  On May 3, 2019, news broke via a popular website that a competing service,

14  "Vader Streams," was taken offline due to a piracy investigation.  *Id.* ¶ 41.  The

15  *same day* the article was published, Defendants issued an urgent announcement,

16  stating they would "BE ELIMINATING VOD, CATCHUP SERVICES, AND TV

17  SERIES.  THIS IS IN LIGHT OF RECENT EVENTS WHICH CAUSE US TO

18  ALTER OUR BUSINESS MODEL."  *Id.* ¶ 41, Ex. 21.  A "Crystal Clear" reseller

19  later stated that the reason why "VOD, TV Series and Catch-up is gone" is because

20  "[s]ervices got rid of VOD as they don't want to end up like Vaders."  *Id.*

21  

22

23

24

25

26

27

28

1  But Defendants did not actually stop providing their VOD offering.  Instead,

2  after announcing the VOD shutdown, Defendants continued to sell subscriptions to

3  their VOD service for $10 a month under the false label of "Virtual Reality Gaming

4  … Addon."  *Id.* ¶ 42, Ex. 22.  The Virtual Reality Gaming label is a deliberate effort

5  to hide what Defendants are really providing.  Defendant Todd Smith has told

6  customers via chat that this is "NOT a VR Gaming plan, it is really our VOD

7  service." *Id.*

8
9
10
11
12
13
14
15
16
17



18  In still further efforts to cover their tracks, Defendants have recently taken

19  some of their Websites offline and moved their customer and reseller inquiries to

20  private messaging, while still providing their infringing IPTV and VOD services.

21  *Id.* ¶¶ 38–40.  Defendants' efforts to hide their infringing activity does not change

22  the fact they are still engaged in a mass infringing scheme, but Defendants'

23  subterfuge does show they are well aware they are running an illegal business.

24  **ARGUMENT**

25  The Copyright Act authorizes courts to grant injunctive relief "to prevent or

26  restrain infringement of a copyright."  17 U.S.C. § 502(a).  Plaintiffs meet the

27  standard for preliminary injunctive relief:  "(1) [they are] likely to succeed on the

28  merits, (2) [they are] likely to suffer irreparable harm in the absence of preliminary

relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotations omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

# I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs will succeed on the merits of their infringement claim because they easily establish the elements of (1) "show[ing] ownership of the allegedly infringed material" and (2) "demonstrat[ing] that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *VidAngel*, 869 F.3d at 856 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007)).  Defendants are violating two of Plaintiffs' exclusive rights—the right to publicly perform and the right to reproduce Plaintiffs' Copyrighted Works.  Each violation alone is sufficient to support the requested injunctive relief.  *See A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001).

## A.   Plaintiffs Own Or Control Valid Copyrights In The Works That Defendants Exploit

Plaintiffs have included certificates of registration issued by the Copyright Office for the Copyrighted Works identified in the Complaint with this filing. Declaration of Rose Leda Ehler, ¶¶ 2-43; Exs. 1-42.  The certificates create a presumption of copyright validity and ownership.  17 U.S.C. § 410(c); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011). Plaintiffs' showing establishes ownership.  *See, e.g.*, *TickBox*, 2018 WL 1568698, at *7 (citing attached copyright registration certificates for proof that "Plaintiffs have demonstrated that they own the allegedly infringed material"); *Disney Enters., Inc. v. VidAngel, Inc.* (*VidAngel I*), 224 F. Supp. 3d 957, 969 (C.D. Cal. 2016) ("Plaintiffs have sufficiently demonstrated ownership of the copyrighted works identified in the complaint by providing certificates of registration issued by the Copyright Office."), *aff'd*, 869 F.3d 848 (9th Cir. 2017).

### B.   Defendants' Infringe Plaintiffs' Exclusive Rights

#### 1.   Defendants Publicly Perform Plaintiffs' Copyrighted Works And Are Directly Liable For Infringement

Plaintiffs have the exclusive right, among others, "to perform the [C]opyrighted [W]orks publicly."[5]  17 U.S.C. § 106(4).  Streaming copyrighted movies and television programs over the Internet to customers without the copyright holder's authorization violates the exclusive public performance right.  *See, e.g.*, *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 431 (2014) (finding Internet streaming constitutes public performance); *VidAngel I*, 224 F. Supp. 3d at 970–71 (streaming motion pictures from master copies constituted "publicly performing"); *Nitro TV*, 2020 WL 3124347, at *2 ("The internet streaming of full copyrighted works without authorization constitutes a violation of this exclusive right."); *TickBox*, 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) ("Broadcasting copyrighted video content to the public over the internet without authorization infringes upon the copyright owner's public performance right."); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1151 (C.D. Cal. 2012) (enjoining defendant streaming service from "retransmitting, streaming, or otherwise publicly performing" plaintiffs' copyrighted works); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.* (*Zediva*), 824 F. Supp. 2d 1003, 1006–07, 1010–11 (C.D. Cal. 2011) (holding service violated public performance right by streaming contents of DVDs from DVD players purportedly assigned to individual users).

Defendants' streaming of the Copyrighted Works violates the public performance right.  Analysis of the streams through the CCM Platforms (both the

---

[5] A party performs a work publicly when it "transmit[s] or otherwise communicate[s] a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times."  *Id*. § 101(2) (definition of "[t]o perform . . . a work 'publicly'").

website interface (webplayer.us) and the downloadable application) shows that the stream is coming from Defendants' website ccreborn.one. *Id.* ¶ 27.[6]  Defendants thus violate the public performance right directly by transmitting performances of the Copyrighted Works to a public audience.  *See Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 11 (2d Cir. 2000) ("a public performance . . . includes 'each step in the process by which a protected work wends its way to its audience'").[7]

> ### 2. Defendants Are Responsible For The Infringing Reproduction Of Plaintiffs' Copyrighted Works
>
> #### (a) Defendants' 24/7 Channels And VOD Service Necessarily Require The Unauthorized Copying Of Plaintiffs' Copyrighted Works

Plaintiffs have the exclusive right "to reproduce" their works, 17 U.S.C. § 106(1), which includes the right to create digital copies.  *See, e.g.*, *Napster*, 239 F.3d at 1014 ("download[ing] files containing copyrighted music violate[s] plaintiffs' reproduction rights"); *Disney Enters., Inc. v. VidAngel, Inc.*, 371 F .Supp. 3d 708, 717 (C.D. Cal. 2019) ("extract[ing] data files" and "creat[ing] 'locally cached' file[]" is copying); *Nitro TV*, 2020 WL 3124347, at *2 (preliminarily enjoining similar service offering 24/7 channels and VOD because "digitally reproducing the Copyrighted Works on Nitro TV violates Plaintiffs' reproduction

---

[6] The declaration from Plaintiffs' investigator provides proof of Defendants' infringing conduct.  *See Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW), 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work.") (collecting cases); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 n.16 (S.D.N.Y. 2009) ("Courts routinely base findings of infringement on the actions of plaintiffs' investigators.").

[7] To the extent Defendants are not directly liable for infringing the public performance right, they are secondarily liable for the same reasons discussed in subsection 2, *infra*.

right.").  To create and offer Defendants' 24/7 channels and VOD library, third parties, acting in concert with Defendants, must create unauthorized copies of Plaintiffs' Copyrighted Works, thereby necessarily infringing Plaintiffs' reproduction rights.

The 24/7 channels continuously stream a single movie (e.g., *Just Mercy*), all of the movies in a franchise or collection (e.g., all of the *Harry Potter* movies), or all of the episodes in a television series (e.g., *The Office*).  Van Voorn Decl. ¶ 25. Unlike the unauthorized streaming of live offerings (e.g., Disney Channel, Paramount Network, and FX) that are appropriated from other distributors and streamed contemporaneously with the original source of the telecast via the CCM Platforms, the 24/7 channels are not restreamed broadcast channels.  *Id.* ¶ 26. Indeed, these 24/7 channels are not an offering that can be obtained through a legitimate live broadcast or transmission service—they necessarily must have been specially compiled.  *Id.*  Creating the compilations necessarily entails reproducing copies of the relevant movie(s) or television program(s) to assemble them in order to be streamed in a continuous loop for the purpose of transmitting them nonstop to CCM subscribers via the CCM Platforms.  *Id.*

Defendants' VOD service likewise depends on a library of digital copies of the Copyrighted Works.  *Id.* ¶ 32.  The content library necessarily was copied and is stored on servers, which must be accessed for Defendants to provide "on demand" streams at the moment their subscribers request those streams.  *Id.*

**(b)   Defendants Are Secondarily Liable For The Infringement Of Plaintiffs' Reproduction Rights**

Defendants are responsible for the third parties' copying of Plaintiffs' Copyrighted Works under well-established doctrines of secondary liability.  Indirect infringement theories of liability—either contributory infringement or inducement— each provide an independent basis to support an injunction.  *See, e.g.*, *TickBox*, 2018 WL 1568698, at *8 (granting preliminary injunction on basis of likelihood to

succeed on inducement to infringe claim); *see also Dragon Box*, 2018 WL 7891027, at *4 (issuing order to show cause why preliminary injunction should not issue because "the Court is persuaded that all four elements set forth in Fung are likely satisfied").

**Contributory Infringement** is established where the defendant "has knowledge of another's infringement" and "materially contributes" to that infringement. *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 745 (9th Cir. 2019) (citation omitted). Both elements are plainly satisfied here.

First, the knowledge element is satisfied if a defendant, inter alia, knows or has reason to know of the underlying infringing activity. *Napster*, 239 F.3d at 1020 (finding knowledge element satisfied). Defendants obviously know that Plaintiffs' works are being copied without authorization to fuel the 24/7 channels and VOD offerings. Defendants utilize misleading labels, such as "Server," "Web Hosting Plans," and "Virtual Reality Gaming" (for their IPTV subscriptions, reseller credits, and VOD offerings, respectively), to hide their illegal activity from detection. Defendants have taken steps to hide their tracks and anonymize their operations— including by deleting their prior Facebook groups, YouTube marketing channel, and Reddit group, and moving their customer support and reseller discussion groups to private channels. Van Voorn Decl. ¶¶ 37–41. These actions are further proof that Defendants know the nature of their offering, including the copying necessary to fuel the 24/7 channels and VOD service, are infringing. *See Elsevier Inc. v. Stew Yee Chew*, No. 17 civ. 6225 (JGK) (GWG), 2019 WL 74606, at *9 (S.D.N.Y. Jan. 2, 2019) (finding infringement was willful where the defendant "attempted to change or conceal their identities to avoid detection"); *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1096 (C.D. Cal. 2009) (noting that services that register domain names through a proxy to allow registrants to remain anonymous "[n]aturally . . . appeal to registrants who wish to conceal their identities for illegitimate purposes").

Second, a defendant materially contributes to a third party's direct infringement where the defendant "substantially assists websites to distribute their infringing copies to a worldwide audience and assists a worldwide audience of users to access infringing materials." *Perfect 10, Inc.*, 508 F.3d at 1172.  This is exactly what Defendants are doing with their 24/7 channels and VOD service:  Defendants' subscribers demand access to infringing streams that originate from infringing copies of Plaintiffs' Copyrighted Works.  *See, e.g.*, *Napster*, 239 F.3d at 1022–23; *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability.").  By delivering subscribers demanding access to infringing copies, Defendants materially contribute to third parties' making those copies.  That suffices to establish material contribution.  *Perfect 10*, 508 F.3d at 1172.

**Inducement to Infringe** is established where (i) the Defendant distributes "a device or product," including "providing some service used in accomplishing the infringement"; (ii) a third party engages in "acts of infringement"; (iii) the Defendant has "an object" of "promoting [the device's or product's] use to infringe copyright"; and (iv) "causation" of infringement.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).

1.  **Distribution of Product:**  Defendants distribute the CCM Platforms that provides end users with unauthorized access to copyrighted content, Van Voorn Decl. ¶¶ 7, 27; *see TickBox*, 2018 WL 1568698, at *8 ("one may be liable for copyright infringement under the *Grokster* inducement theory if . . . he provides a service that facilitates copyright infringement" (citing *Fung*, 710 F.3d at 1033)).

2.  **Direct Infringement:**  The creation of the 24/7 channels and the library of VOD content necessarily requires those individuals and entities responsible to

make and store copies, in violation of the reproduction right.  Van Voorn Decl. ¶ 26; *see TickBox*, 2018 WL 1568698, at *10 (element satisfied when "defendant's device or service is funneling users to third parties that are directly infringing upon the plaintiffs' exclusive rights under the Copyright Act (i.e., displaying copyrighted images or broadcasting copyrighted video content)").

3.  **Object of Promotion Is Infringement:**  Defendants are clearly acting "with the object of promoting [the CCM service] use to infringe copyright," as shown by "affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936–37.  Before relying on their resellers for marketing, Defendants promoted their service as "the highest quality streams at the most affordable prices!"  Van Voorn Decl. ¶ 16, Ex. 5.  Such advertising is "the classic instance of inducement." *Grockster*, 545 U.S. at 937.  Defendants have moved to a model of relying on the resellers to do Defendants' "dirty work" of marketing the illegal service, but Defendants' object is still to promote the use of their services to infringe.  Van Voorn Decl. ¶ 35, Ex. 17 (image of reseller marketing).  These resellers claim, for example, that they provide an "the lowest cost, highest quality, most reliable alternative to cable and satellite tv." *Id.*  And they aggressively market the infringing services for Defendants' benefit in terms of increased profits—which is exactly how Defendants intend for the system to work.  Defendants' profits are driven by the volume of subscribers. *See Fung*, 710 F.3d at 1037 ("The more users who visit [Defendant] Fung's websites and view the advertisements supplied by Fung's business partners, the greater the revenues to Fung."); *see also*

1    *TickBox*, 2018 WL 1568698, at *11 (profits derived from infringement

2    relevant to this factor).[8]

3    4.   **Causation:**  The causation element is plainly satisfied based on the evidence

4         of Defendants' role in the infringing enterprise.  *Fung*, 710 F.3d at 1037 ("[I]f

5         one provides a service that could be used to infringe copyrights, with the

6         manifested intent that the service actually be used in that manner, that person

7         is liable for the infringement that occurs through the use of the service."); *see*

8         *also China Cent. Television v. Create New Tech. (HK) Ltd.*, No. CV 15-

9         01869-MMM-MRWx, 2015 WL 3649187, at *10 (C.D. Cal. June 11, 2015)

10        ("defendants are the but-for cause of [the] infringement, i.e., their distribution

11        and promotion of the Infringing TVpad Apps is the mechanism that makes

12        that infringement by a large number of users possible.").

13   Defendants are, at a minimum, secondarily liable for their conduct.[9]

14   **II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
15        INJUNCTION**

16        Defendants have already inflicted irreparable harms on Plaintiffs and will

17   continue to do so until they are enjoined.  Courts have found irreparable harm

18   threatened by similar infringing online streaming services.  *See, e.g.*, *WPIX, Inc. v.*

19   *ivi, Inc.*, 691 F. 3d 275, 285–87 (2d Cir. 2012) (finding extensive irreparable harms

20   caused by unlicensed Internet retransmissions of live television channels);

21

22   _____

23   [8] Moreover, Defendants provide customer support and detailed "instructions to
     [CCM subscribers] concerning how to effectively access copyrighted material,"
24   which also shows Defendants' object to promote infringement.  *TickBox*, 2018 WL
     1568698, at *11.
25

26   [9] Without further discovery, Plaintiffs cannot conclusively establish that Defendants
     directly make reproductions of the Copyrighted Works for the 24/7 channels and
27   VOD service.  Based on circumstantial evidence and other anti-piracy
     investigations, Plaintiffs are informed and believe that Defendants play a role in the
28   unauthorized reproduction and reserve this claim for summary judgment.

1  *BarryDriller*, 915 F. Supp. 2d at 1147 (same); *Nitro TV*, 2020 WL 3124347, at *2

2  (finding Plaintiffs' demonstrated irreparable harm for similar IPTV and VOD

3  service).

4       First, Defendants and the CCM service interfere with Plaintiffs' basic right as

5  the copyright holders to control "when, where, to whom, and for how much they

6  will authorize transmission of their Copyrighted Works to the public." *Zediva*, 824

7  F. Supp. 2d at 1012.  Defendants usurp Plaintiffs' control over the exercise of their

8  exclusive rights by interfering with Plaintiffs' distribution strategies, particularly

9  their right to structure the offering of their Copyrighted Works to the public through

10  downstream services, often by exclusive licenses and/or varying the time and

11  medium by which a particular Copyrighted Work is available (known as

12  "windowing").  Kang Decl. ¶¶ 7-11, 13-15, 18-22.  Defendants directly interfere

13  with Plaintiffs' distribution strategies in at least three ways:  (1) Defendants offer

14  *more* channels and content than are available on any legitimate service, over 6,000

15  live and title-curated channels and massive library of VOD content (over 14,000

16  movies and 3,000 TV series, which often include multiple seasons and episodes per

17  series),Van Voorn Decl. ¶¶ 22, 29; (2) Defendants do not honor geographic

18  restrictions and thus stream numerous versions of the ABC, CBS, CW, NBC, and

19  FOX channels from multiple cities across the U.S. to all CCM subscribers wherever

20  they are located, exceeding the licensed offerings on legitimate cable or satellite

21  providers, *id.* ¶ 23, Ex. 11; and (3) Defendants' 24/7 channels offer a format that

22  Plaintiffs do not license—a "live" transmission of unauthorized copies of an entire

23  movie franchise or TV series, via the CCM Platforms, when no similar offering is

24  available via licensed cable or satellite providers, *id.* ¶ 25.  As courts have

25  confirmed repeatedly, Defendants' operation of the CCM "infringing service

26  without the normal licensing restrictions imposed by Plaintiffs . . . interfere[s] with

27  Plaintiffs' ability to control the use and transmission of their Copyrighted works,

28  thereby, causing irreparable injury." *VidAngel I*, 224 F. Supp. 3d at 975 (quoting

1   *Zediva*, 824 F. Supp. 2d at 1012–13); *Nitro TV*, 2020 WL 3124347, at *2 ("Not only

2   is Defendant directly infringing Plaintiffs' copyrights, creating a financial loss to

3   Plaintiffs, but Plaintiffs have provided evidence that the unlawfully distributed

4   Copyrighted Works may undermine the value of Plaintiffs' legitimate licenses.").

5        Second, unless enjoined, Defendants will interfere with Plaintiffs' existing

6   relationships and goodwill with legitimate online services.  These legitimate

7   services negotiate their licenses and abide by contractual restrictions.  Kang Decl.

8   ¶ 22.  Defendants interfere with these restrictions.  *Id.* ¶¶ 23, 28-29.  For example,

9   the 24/7 channels offer recently released movies that are not widely available, such

10  as Disney's *Artemis Fowl* (2020), Paramount's *Like a Boss* (2020), and Columbia

11  Picture's *Bad Boys for Life* (2020).  Compl. Ex. A (citing recent releases).  This

12  unfair competition undermines Plaintiffs' relationships and their goodwill with

13  licensees:  "If Defendants can transmit Plaintiffs' content without paying a fee,

14  Plaintiffs' existing and prospective licensees will demand concessions to make up

15  the loss of viewership to non-paying alternatives."  *BarryDriller*, 915 F. Supp. 2d at

16  1147; *see also VidAngel I*, 224 F. Supp. 3d at 975 ("Because VidAngel operates

17  without any license and performs Plaintiffs' works during negotiated exclusivity

18  periods it interferes with Plaintiffs' exercise of their exclusive rights and frustrates

19  Plaintiffs' ability to negotiate for similar rights in the future."); *Zediva*, 824 F. Supp.

20  2d at 1012–13 (finding unlicensed streaming "jeopardize[d] the continued existence

21  of Plaintiffs' licensees' businesses" and harmed plaintiffs' goodwill with its

22  licensees).

23       Third, the operation and existence of the CCM service is contributing to

24  consumer confusion regarding what is lawful and what is not by misleading

25  customers into believing that CCM is also legitimate.  Van Voorn Decl. Ex. 17 ("Is

26  SuperStreamz IPTV Legal?  **Yes**, in the United States streaming content is **legal**.").

27  This harms the market for legitimate services by drawing users—not knowing they

28  are accessing content without authorization and attracted by the too-good-to-be-true

price—away from Plaintiffs' licensees.  *See Zediva*, 824 F. Supp. 2d at 1013 (finding that defendants' service threatened "to create incorrect but lasting impressions with consumers about what constitute[d] lawful video on demand exploitation" of copyrighted works); *Nitro TV*, 2020 WL 3124347, at *2 (unauthorized IPTV and VOD service could "also lead to unquantifiable customer confusion and an overall diminution of value of the Copyrighted Works").

Finally, monetary damages will not adequately compensate Plaintiffs for the loss of control over the Copyrighted Works, the damage to their business goodwill, and harm to the continued advancement of the legitimate online market for distribution of creative works.  Kang Decl. ¶ 33; *see TickBox*, 2018 WL 1568698, at *13 ("[I]t is unlikely that money damages could adequately compensate for difficult-to-quantify harms to Plaintiffs' business models and relationships" from unauthorized streaming.).  Money damages also are inadequate because there is no reasonable prospect that Defendants will be able to satisfy an award in this case.  The statutory damages for each work infringed through Defendants' willful inducement may be as much as $150,000.  17 U.S.C. § 504(c).  Plaintiffs collectively own thousands of Copyrighted Works, a substantial number of which have been infringed as the result of Defendants' illegal conduct.  Defendants therefore will be responsible for a damages award far in excess of their ability to pay.  *See, e.g.*, *BarryDriller*, 915 F. Supp. 2d at 1147; *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("[A]n award of monetary damages will be meaningless, and the plaintiff will have no substantive relief, where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant.").

The scope of foregoing harms caused by Defendants and those acting in concert with them continues to grow, as Defendants' reseller network expands.  Kang Decl. ¶ 25.  Since Defendants have gone underground, it has become more difficult to identify those resellers associated with the CCM Service, but Plaintiffs

1   are aware of a few dozen.  Van Voorn Decl. ¶ 37 (listing known resellers).  And

2   Todd Smith has bragged to customers that Defendants have "sellers all over the

3   world."  *Id.* ¶ 36.  This number is likely to continue to grow.

4   **III.   THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFFS'**

5   **FAVOR**

6          Before issuing a preliminary injunction, a court "must balance the competing

7   claims of injury and must consider the effect on each party of the granting or

8   withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).

9          The threat of harm to Plaintiffs is substantial.  *See* Section II, *supra*.  By

10  contrast, Defendants "cannot complain of the harm that will befall it when properly

11  forced to desist from its infringing activities."  *Triad Sys. Corp. v. Se. Express Co.*,

12  64 F.3d 1330, 1338 (9th Cir. 1995), *superseded by statute on other grounds*, 17

13  U.S.C. § 117(c); *see Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830

14  (9th Cir. 1997) ("[W]here the only hardship that the defendant will suffer is lost

15  profits from an activity which has been shown likely to be infringing, such an

16  argument in defense merits little equitable consideration . . . .") (citations omitted);

17  *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) ("Since

18  [small start-up defendant] does not (and cannot) claim any legitimate hardships as a

19  result of being enjoined from committing unlawful activities, and Apple would

20  suffer irreparable and immeasurable harms if an injunction were not issued, this

21  factor weighs strongly in favor of Apple's motion.").

22         The balance of hardship factor is decidedly in Plaintiffs' favor.

23  **IV.   AN INJUNCTION WOULD SERVICE THE PUBLIC INTEREST**

24         The court must also consider whether the issuance of an injunction would be

25  in the public interest.  *Winter*, 555 U.S. at 24.

26         Upholding copyright protection is in the public interest.  *See Eldred v.*

27  *Ashcroft*, 537 U.S. 186, 212 n.18 (2002) ("[t]he economic philosophy behind the

28  [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by

personal gain is the best way to advance public welfare through the talents of authors and inventors") (citation omitted); *VidAngel*, 869 F.3d at 867 ("[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming and motion pictures.") (internal quotations and citation omitted); *Kelly v. Primco Mgmt., Inc.*, No. CV-1407263 BRO (SHx), 2015 WL 10990368, at *16 (C.D. Cal. Jan. 12, 2015) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . ."). By contrast, "Defendant[s'] alleged copyright infringement does not offer any lawful benefit to the public." *Nitro TV*, 2020 WL 3124347, at *3.

* * *

In sum, a preliminary injunction should issue because the Plaintiffs are likely to succeed on the merits, they stand to suffer irreparable harm, the balance of hardships between the parties supports the issuance of a preliminary injunction and such an injunction would be in the public interest.

## RELIEF REQUESTED

### A.   Plaintiffs Request An Injunction That Protects Their Copyrights

Plaintiffs' requested injunction has two parts:  (1) prohibiting further infringement, including copying, streaming, or otherwise exercising any of Plaintiffs' exclusive rights without authorization; and (2) temporarily freezing Defendants' Websites so those Websites cannot be accessed or transferred during the pendency of this action.

This injunction applies to Defendants and to those acting in concert with them, including their resellers which market and sell the illegal CCM service.  Van Voorn Decl. ¶ 37 (list of previously identified resellers).  Plaintiffs have learned, through unfortunate experience, that infringers—confronted with a lawsuit seeking to stop their ongoing infringement—are likely to transfer their operations to a close

1   associate, such as a reseller[10], or instruct their domain registrar to transfer their

2   domain name to another entity not subject to the jurisdiction of this Court and revive

3   their infringing activities using new servers and infrastructure.  Courts ensure that

4   the injunctive relief is sufficiently broad to avoid this result.  *See Nitro TV*, 2020

5   WL 3124347, at *3 (enjoining Namecheap, Inc. and Domain.com LLC from

6   "allowing the Infringing Domain Names to be modified, sold, transferred to another

7   owner, or deleted"); *Showtime Networks Inc. v. Doe*, No. 2:15-CV-03147-GW-

8   MRW, 2015 WL 12646501, at *2 (C.D. Cal. Apr. 30, 2015) (temporary restraining

9   order requiring all "hosts, registrars and name servers" to "suspend all services with

10  respect to Defendants' Infringing Websites" to prevent specific illegal streaming).

## B.   No Bond Should Be Required

12       Plaintiffs request that the Court order that no bond is required.  A security

13  bond is not required when entering a preliminary injunction.  *Diaz v. Brewer*, 656

14  F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion 'as to the

15  amount of security required, *if any*.'") (quoting *Johnson v. Couturier*, 572 F.3d

16  1067, 1086 (9th Cir. 2009)).  Any hardship Defendants face result from their

17  voluntary decision to build a business around violating Plaintiffs' rights.  Plaintiffs

18  respectfully submit that no security should be required.

## CONCLUSION

20       For the foregoing reasons, Plaintiffs respectfully request that the Court grant

21  the requested preliminary injunction.

---

[10] Indeed, Defendants already attempted to publicly distance themselves from the VOD offerings (meanwhile offering it covertly as "Virtual Reality Gaming").  Publicly, Defendants referred customers to one of their resellers.  Van Voorn Decl. ¶ 41, Ex. 21 ("If you are interested in adding VOD/Series as an addon please email Angie at vodstreamz@gmail.com"....).

1

2   DATED:  August 14, 2020                  MUNGER, TOLLES & OLSON LLP

3

4

5                                           By:  _____/s/ Rose Leda Ehler_____

6                                                ROSE LEDA EHLER
                                                 Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28